875 A.2d 969

JOSE MARTE, PLAINTIFF–APPELLANT, v. CLAUDIA OLIVERAS, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued telephonically May 25, 2005—Decided June 14, 2005.

Before Judges KESTIN, LEFELT and ALLEY.

*Richard P. Crossin,* argued the cause for appellant (*Altamura & Crossin,* attorneys; *Mr. Crossin,* on the brief).

*Martin S. Zipern,* argued the cause for respondent (*Reiter and Zipern,* attorneys; *Arnold E. Reiter,* on the brief).

The opinion of the court was delivered by

ALLEY, J.A.D.

Plaintiff and defendant were married in 1977 and had a daughter, Teresa Marte, in 1978. When they were divorced shortly thereafter, defendant obtained custody of Teresa. Plaintiff and his witnesses maintained that he visited Teresa and paid child support, but according to defendant, plaintiff rarely made support payments and did not spend much time with his daughter. Plaintiff remarried and had two other daughters. Defendant also remarried and had a son.

Teresa underwent a life-changing experience in 1988, on the day of her First Communion, when she was in a car that had stopped for gas. Someone outside the car sparked a lighter and a fire resulted. Teresa sustained burns on over forty percent of her body, although she survived after eleven months of hospitalization and residential rehabilitation.

Plaintiff claims that defendant spoke to him about filing a lawsuit to recover for Teresa's injuries, that he accompanied her to the office of a lawyer she had selected, and that he signed some papers that he was told through a Spanish interpreter were necessary to start the suit. Plaintiff asserts that he does not speak, read or write English, whereas defendant speaks "perfect English." Also according to plaintiff, defendant told him that she would tell him what was needed for the lawsuit. He willingly let her handle the lawsuit due to his limited English. He contends that he was shocked when a newspaper revealed that Teresa was getting a $3 million settlement. He had no knowledge of a settlement and did not consent to it. He claimed defendant called

him and told him not to believe what the papers had written and that Teresa was only going to receive one million dollars.

Defendant, however, contended that she never spoke to plaintiff about starting a lawsuit "as he was not at all interested in anything to do with her welfare or any money she might receive as a result of the accident. He just did not care." Further, she claimed that plaintiff understood and spoke English fluently. She denied telling him not to believe what he read in the papers concerning the lawsuit.

What occurred was that a lawsuit was filed by Teresa, with her mother as her guardian ad litem. Both her mother and father had individual claims as well. They were all represented by the same attorneys. Under a settlement reached in 1993, Teresa obtained a $3 million annuity which paid her $4,250 per month, with payments to increase by three percent each year. Lump sum payments, ranging from $15,000 to $500,000, were also set forth. Defendant testified at the "friendly" hearing that she had talked to plaintiff and that he approved of the settlement. Plaintiff claimed that he was not notified about the "friendly" hearing, so he did not attend.

At the direction of the judge before whom the settlement was reached, defendant applied to be the guardian of Teresa's assets, and with plaintiff's consent, was appointed. Defendant named herself as the primary beneficiary, and plaintiff and Teresa's half-brother were named equal secondary beneficiaries. There was no evidence that defendant received court approval to so designate herself.

Plaintiff also maintains that he did not agree that defendant should be the sole beneficiary of the annuity in the event Teresa predeceased them. Defendant claimed that plaintiff gave his consent for her to be the beneficiary.

On January 8, 2000, Teresa died of pneumonia at the age of twenty-one. An aunt of defendant's certified that, immediately after Teresa's funeral, she heard defendant tell plaintiff that

although she had been named the beneficiary of the annuity, she was willing to have plaintiff or his children share in the annuity. Plaintiff said he wanted no part of the money. Defendant offered the same account.

Plaintiff claimed that on January 21, 2000, defendant asked him to sign a paper to permit a police investigation into Teresa's death. Plaintiff denied ever seeing a form dated January 21, 2000, with the heading "Bergen County Surrogate's Court." The paper, signed by plaintiff, is a "Renunciation for Administration Ad Prosequendum" for Teresa's estate, and requests the appointment of defendant as the administrator of the estate.

On the same date, according to plaintiff and his wife, defendant asked him what he wanted to do about some money Teresa had left when she died, but plaintiff did not want to talk about it. Defendant said that Teresa wanted to leave some money for the education of her half-sisters, Chantelle and Suzelle. Plaintiff said that whatever Teresa wanted was fine with him. Defendant told him that there would not be much money left after the State took its share.

On March 31, 2003, plaintiff filed a complaint against defendant alleging conversion, breach of fiduciary duty, and "unjust enrichment and constructive trust." On May 22, 2003, defendant answered the complaint. Defendant moved for summary judgment, plaintiff opposed, and the judge granted defendant's motion in a decision read from the bench on January 20, 2004. He signed an order dismissing the case on January 26, 2004. Although plaintiff moved for reconsideration, the court denied the motion.

In reviewing summary judgment orders, "[w]e employ the same standard that governs trial courts" in determining whether or not to grant them. *Prudential Prop. & Cas. Ins. Co. v. Boylan*, 307 *N.J.Super.* 162, 167, 704 *A.*2d 597 (App.Div.1998). A trial judge cannot grant summary judgment in the face of genuine issues of material fact and if the moving party is not entitled to judgment as a matter of law. *R.* 4:46–2. The record must be considered in a light most favorable to the opponent of the motion, and all

doubts resolved against the movant. *Ruvolo v. American Cas. Co.*, 39 *N.J.* 490, 499, 189 *A.2d* 204 (1963); *see generally Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 540, 666 *A.2d* 146 (1995).

Although the judge set forth his reasons for the grant of summary judgment in his initial ruling, after being presented with the documents filed on the motion for reconsideration, he examined the matter de novo. Thus, we focus on his decision on the reconsideration motion.

■ In ruling on the summary judgment motion, after quoting *R.* 4:85–1,[1] the judge stated:

> Broken down, this rule provides a four-month statute of limitations for ... persons aggrieved to challenge number one, the probate of a will; ... number two, grant of letters testamentary; number three, appointment of an administrator; number four, and ... appointment of a guardian; or five, appointment of a trustee. Therefore, the statute of limitations for plaintiff's claim began to r[u]n on July 19, 1993, when Claudia Oliveras was appointed, and again I quote, "guardian of the person and property to Teresa Marte."
>
> The statute also applied to Claudia Oliveras's appointment as administratrix ad prosequendum, [of] Teresa Marte's estate.... Again, I wish to note that plaintiff concedes that he consented to Oliveras's appointment as administratrix ad prosequenduam [sic].

The judge then discussed *R.* 4:50–1, which provides for relief from judgment, noting that the applicant bears the burden to show extraordinary circumstances. The judge continued:

---

1 Rule 4:85–1, entitled "Complaint; Time for Filing" provides:

> If a will has been probated by the Surrogate's Court or letters testamentary or of administration, guardianship or trusteeship have been issued, any person aggrieved by that action may, upon the filing of a complaint setting forth the basis for the relief sought, obtain an order requiring the personal representative, guardian or trustee to show cause why the probate should not be set aside or modified or the grant of letters or appointment vacated, provided, however, the complaint is filed within four months after probate or of the grant of letters of appointment, as the case may be.... If relief, however, is sought based upon *R.* 4:50–1(d),(e) or (f) or *R.* 4:50–3 (fraud upon the court) the complaint shall be filed within a reasonable time under the circumstances[.]

> Plaintiff, having filed suit ten years after the grant of letters of guardianship, does not present evidence to support a finding of extraordinary circumstances that would permit this Court to apply Rule 4:50–1(f), nor does this Court find that the ten years is a . . . reasonable time.
>
> Further damaging to plaintiff Marte's claim is the fact that he expressly renounced his right to serve as guardian and signed a notarized consent to Defendant Oliveras's appointment as such. If he did not understand the ramifications of doing so, he could have consulted his attorney or appeared before the Court on July 19, 1993, the date on which he signed the consent to guardianship, and the date of the friendly hearing, and the date of the entry of judgment. Based solely upon the foregoing, defendant Claudia Oliveras is entitled, I find, to judgment as a matter of law.

Plaintiff contends that the judge erred in dismissing his complaint as time-barred by *R.* 4:85–1 because he did not seek review of the Surrogate's grant of defendant's guardianship or letters testamentary. Plaintiff acknowledges that he consented to both. Instead, plaintiff claims that he was aggrieved by the actions defendant took in her representative capacity, "actions taken in secret and concealed for almost ten years."

We agree with plaintiff, in light of all the circumstances, that the judge misapplied *R.* 4:85–1. Under the Rule, one aggrieved by the appointment of a guardian has four months to seek to set aside the appointment. In this case, plaintiff consented to defendant's appointment. He was not aggrieved by it, nor was he seeking to set it aside. He was attacking later actions taken by the guardian, a situation not covered by the time limitation of *R.* 4:85–1.[2]

After the judge found that defendant was entitled to summary judgment under *R.* 4:85–1, he stated, in addressing "plaintiff's arguments regarding breach of fiduciary duty and concealment,"

---

[2] Plaintiff maintains that the appropriate statutes of limitations are those that govern claims of fraud, misrepresentation and breach of fiduciary duty, and that he did not waive his rights under these theories. Because defendant did not argue that summary judgment should be granted based on a violation of the statute of limitations of these causes of action and the judge did not dismiss the action on those grounds, we do not address the merits of plaintiff's contentions.

[t]he Court finds that Defendant Oliveras acted within her authority in designating herself as primary beneficiary of the annuity, in the case that Teresa Marte predeceased her. And I say that for the following reason.

The role of guardian is a powerful one. The duties and authority of persons appointed guardian of the property of a minor, as is the case in the instant matter, are governed by *N.J.S.A.* 3B:12–49, which confers the following powers upon the Court, and permits the Court to confer those powers upon a guardian and I quote:

After quoting *N.J.S.A.* 3B:12–49,[3] the judge cited *In re the Guardianship of A.D.L.*, 208 *N.J.Super.* 618, 506 *A.2d* 792 (App. Div.1986), as supporting a guardian's decision to enter into annuity contracts on behalf of the ward and to name the guardian herself as beneficiary of the annuity. He concluded,

based upon the plain language of the aforementioned statutes, and the reasoning of the ... *A.D.L.* case, that defendant Oliveras was within her authority as guardian of the person and indeed the property of her minor daughter to sign the structured settlement agreement and to name herself as beneficiary, albeit contingent beneficiary of the annuity at issue. Plaintiff's allegations of impermissible self-dealing are, therefore, without merit.

Again, parenthetically, and in contrast, plaintiff fails to cite a single case that prohibits such action by a guardian, and I emphasize guardian, relying instead on cases in which the issues center around the actions of a trustee.

Plaintiff contends that the judge erred in reaching this conclusion, and that defendant breached her duties as a guardian by not seeking court approval under *N.J.S.A.* 3B:12–49 for her to be the beneficiary of the annuity. He argues that the judge misapplied

---

[3] The statute is entitled "Powers conferred upon the court," and provides in pertinent part:

The court has, for the benefit of the ward, his dependents and members of his household, all the powers over his estate and affairs which he could exercise if present and not under a disability, except the power to make a will, and may confer those powers upon a guardian of his estate. These powers include, but are not limited to power to convey or release the ward's present and contingent and expectant interests in real and personal property ... to exercise and release his powers as trustee, personal representative, custodian for minors, guardian, or donee of his power of appointment, to enter into contracts, to create revocable or irrevocable trusts of property of the estate which may extend beyond his disability or life, to exercise his options to purchase securities of other property, to exercise his rights to elect options and change beneficiaries under insurance annuity policies and to surrender the policies for their cash value[.]

both the statute and the case law in reaching his conclusion. We agree.

In *A.D.L., supra,* 208 *N.J.Super.* at 621, 506 *A.*2d 792, the question before us was "whether a court may authorize a guardian to invest a minor's funds in an annuity contract which contemplates deferred periodic payments extending beyond minority." We described the annuity contract, including the provision that if the minor died before receiving all his payments, "the rest would be paid to his mother or the designee he selected after reaching majority." *Id.* at 622, 506 *A.*2d 792. We held that the "court had authority under *N.J.S.A.* 3B:12–49 to permit such a purchase." *A.D.L., supra,* 208 *N.J.Super.* at 622, 506 *A.*2d 792. We cautioned, however, that

[a]uthorization should be granted only on specific application and only if the court is satisfied either that the provisions of the annuity contract will not impound the minor's estate[,] ... or if the court is satisfied that the circumstances justify depriving the ward of absolute and unrestricted enjoyment of the estate upon majority.
*[Id.* at 626, 506 *A.*2d 792.]

We noted that the "court should consider a broad range of elements." *Id.* at 626–27, 506 *A.*2d 792. We made no further mention of the designation of the minor's mother as the beneficiary, although the court noted that the minor's father was deceased. *Id.* at 621, 506 *A.*2d 792.

In determining that *A.D.L.* was instructive, the trial judge here stated that he "did not consider as a matter of consequence the fact that the mother and then guardian was named the alternate beneficiary."

It appears that the trial court failed to acknowledge a crucial distinction between *A.D.L.* and this case, however. In *A.D.L.,* the guardian sought court approval, pursuant to *N.J.S.A.* 3B:12–49, to purchase the annuity. We noted in *A.D.L.* that the question was "whether a court may authorize a guardian" to buy the annuity contract, and that the guardian had applied to the Law Division "for permission to use the funds to purchase an annuity contract." *Id.* at 621, 506 *A.*2d 792. We pointed out "[i]f the guardian should

apply for authorization to purchase a particular annuity contract, the application should be entertained by the Law Division in a manner consistent herewith." *Id.* at 628, 506 *A*.2d 792.

Clearly, the guardian in *A.D.L.* understood that she had to receive court approval to act. In this case, although defendant entered into the structured settlement that provided the annuity contract, she did not seek court approval to be named the sole beneficiary. We emphasize that she ought to have sought such authority pursuant to *N.J.S.A.* 3B:12–49, because the court has "all the powers over his estate and affairs" and "may confer those powers upon a guardian of his estate." Those powers include the power "to exercise his rights to elect options and change beneficiaries under insurance annuity policies and to surrender the policies for their cash value." Naming a beneficiary of a contract, especially when the guardian was the beneficiary, was an act that needed court approval under *N.J.S.A.* 3B:12–49.

■ The judge believed that plaintiff's claims that defendant engaged in self-dealing were without merit and mentioned that plaintiff failed "to cite a single case that prohibits such action by a guardian." If plaintiff failed to cite cases, it was not because there was a dearth of them. Numerous cases note the presumption against the validity of a gift between a guardian and a ward, such as *Seylaz v. Bennett,* 5 *N.J.* 168, 172, 74 *A*.2d 309 (1950), *Peppler v. Roffe,* 122 *N.J.Eq.* 510, 515, 194 *A.* 548 (E. & A.1937), *Brotherhood of R.R. Trainmen v. Van Etten,* 90 *N.J.Eq.* 612, 614, 110 *A.* 121 (E. & A.1919), and *Melos v. Hagen,* 99 *N.J.Eq.* 683, 688, 133 *A.* 538 (Ch.1926). When defendant named herself beneficiary of the annuity, this was akin to making herself a gift, in that she continued to receive the payouts under the structured settlement after Teresa's death.

Because defendant did not obtain court approval before naming herself beneficiary of her daughter's annuity, she did not act within her authority, and the judge erred in finding that she did.

■ The judge did not address defendant's contention that she obtained plaintiff's consent to be the primary beneficiary. The judge seemed to believe that plaintiff's consent did not matter because even if plaintiff did not consent, defendant was permitted to designate herself the beneficiary. But defendant did not have that right without court approval. If defendant obtained plaintiff's consent to name herself beneficiary, plaintiff's case would collapse, but plaintiff denied having knowledge that defendant named herself beneficiary. This created a factual question, an issue that could not be resolved on summary judgment.

Another point of significance is Teresa's age. It cannot be ignored that Teresa attained the age of majority before she died, whereupon defendant's guardianship ended. Plaintiff argues that Teresa did not ratify the beneficiary designation when she reached the age of majority, and that verbal expressions of her testamentary intent were ineffective.

The cases on ratification by a former minor of a guardian's actions are few. In *Island Holding Co. v. Leeds*, 122 *N.J.Eq.* 272, 193 *A.* 689, (Ch.1937), the court quoted a Maine court as stating: "[i]t is competent for a ward, when he becomes of age, to ratify and affirm a sale made by the guardian, where it is invalid for want of compliance with some statute requisite, or to avoid it within a reasonable time." (quoting *Tracy v. Roberts*, 88 *Me.* 310, 34 *A.* 68, 71 (1896)). In agreeing with this statement, the court further noted in *Island Holding Co., supra*, 122 *N.J.Eq.* at 282–84, 193 *A.* 689, that in cases where the ward does not attempt to avoid an obligation entered into by a guardian within a reasonable time after reaching majority, the ward is estopped from claiming that the transaction entered into by the guardian was invalid.

In the early case of *Van Doren v. Everitt*, 5 *N.J.L.* 460, 463 (Sup.Ct.1819), the court held that where a guardian made a lease of the ward's lands which lasted for a longer time than the infancy of the ward, the lease was voidable and the former infant could affirm the lease or avoid it. If, however, he accepted rent or did

any other acts showing his assent, his acts would be construed to be an affirmance. *Ibid.*

In *Mandell v. Passaic National Bank & Trust Co.,* 18 *N.J. Misc.* 455, 459, 14 *A.*2d 523 (Cir.Ct.1940), the court stated, "[t]he mere silence or inaction of a former infant after reaching full age does not amount to a ratification of contracts entered into during infancy." That case involved the question of ratification by a minor who had made a contract herself during her minority. *Id.* at 457, 14 *A.*2d 523. If mere silence or inaction is not sufficient to ratify a contract that the minor made herself, it certainly cannot ratify a contract that the minor did not make herself (and of which she may have been unaware).

Upon reaching majority, Teresa plainly had the right to affirm or disaffirm the naming of the beneficiary of her annuity. Her silence or inaction cannot be taken as ratification. The question, then, is whether she actually knew of the beneficiary provision and whether she affirmed her mother being the sole beneficiary.

Defendant certified that after Teresa became an adult "she made no effort to change the beneficiary designation despite her understanding and knowledge that I was the sole beneficiary as provided for in the structured settlement annuity document." That is the only evidence that Teresa knew about the beneficiary designation and chose not to change it. It potentially conflicts with affidavits submitted by plaintiff's wife, however, and one submitted by plaintiff, in which each stated that after Teresa died, defendant told plaintiff that Teresa wanted to leave something to plaintiff's children for their education.

The judge did not address the issue of ratification directly. Instead, he noted that *N.J.S.A.* 3B:12–55 states that the "authority and responsibility of a guardian of the person or estate of a minor terminate[s] upon ... attainment of 18 years of age, but termination does not affect the guardian's liability for prior acts, nor his obligation to account for funds and assets of his ward." The judge believed that liability for prior acts "by definition, applies to

misuse or embezzlement of funds during the guardianship." He further believed that defendant's prior act of naming herself beneficiary of the annuity funds did not subject her to liability to plaintiff because "number one, she was within her authority to make that designation, and, number two, she did not owe a duty to plaintiff, that duty being owed only to her daughter." The judge noted that there was no allegation that defendant mishandled the annuity funds during her guardianship which might engender liability under *N.J.S.A.* 3B:12–55.

The judge then found that defendant's responsibilities ceased when Teresa turned eighteen years old, and accordingly, the only method of recovery left

> to plaintiff at this juncture is to show that during the period in which Teresa Marte was in full legal control of the annuity proceeds from the structured settlement, her mother, defendant Claudia Oliveras, exercised undue influence upon her daughter and thereby persuaded her to leave defendant as the designated, albeit contingent, beneficiary of the annuity proceeds in the event that her daughter predeceased her. This is indeed a heavy burden for plaintiff to sustain.

The judge then defined undue influence and discussed several cases. He continued:

> Plaintiff does not provide any evidence here that rivals the facts in the aforementioned cases. It is indeed important to reiterate that the discovery end date in this matter was December 24, 2003. In point of fact, plaintiff does not even directly allege undue influence in this matter. Despite Teresa Marte's physical disability as a result of the burns suffered when she was a child, the record reveals that she was physically and mentally independent upon reaching the age of majority. The record does not contain, quite frankly, a scintilla of evidence that defendant Oliveras exercised undue influence over her daughter, and the evidence submitted does not indicate that the circumstances were such that this Court should impose a presumption of undue influence. The Court must emphasize that despite the natural influence of a mother over her daughter, the law requires undue, and I emphasize undue influence, in order to set aside a will, or in this case to alter a contract.

We conclude that the court impermissibly shifted the burden of proof in its decision to grant summary judgment. The judge stated that the burden to show undue influence was "a heavy burden for plaintiff to sustain." He also stated that the record did not contain any evidence that defendant exercised any undue influence over her daughter "and the evidence submitted

does not indicate that the circumstances were such that the Court should impose a presumption of undue influence." The judge failed to recognize the well-established law regarding undue influence. First, as noted above, when there is a gift between ward and guardian during the guardianship, there is a presumption of undue influence. That "presumption continues until the defendant sustains the burden which the law casts upon him." *Melos v. Hagen, supra,* 99 *N.J.Eq.* at 688, 133 *A.* 538. Had Teresa died during her minority, the presumption would have arisen and defendant would have had the burden of proving that the gift was knowing and voluntary. *Peppler v. Roffe, supra,* 122 *N.J.Eq.* at 515, 194 *A.* 548.

Teresa died after the guardianship ended, which raises the question: what was the effect of the termination of the guardianship on the presumption of undue influence? In *Melos, supra,* 99 *N.J.Eq.* at 688, 133 *A.* 538 (internal citation omitted), the court stated:

> My understanding is that it is within the realm of possibility for a ward to contract with his guardian, or, in fact, to make a voluntary donation, either while the relation exists or shortly thereafter, although to sustain such a transaction has been said to be almost impossible. However, when such a voluntary gift is attacked by the ward, there is wisely thrown upon the party occupying, or who has occupied, the dominant position, the burden of proving that the other fully comprehended what he was doing, that it was without any undue influence, that no fraud or deception was practiced, or that any other unconscionable advantage taken by the one who is presumed to have been able to exercise some greater or less degree of influence by reason of the relation existing or that had existed.

■ According to *Melos,* when a gift is made by a ward to a prior guardian "shortly" after the guardianship ends, the burden is still on the guardian to show a lack of undue influence. *Ibid.*

Even after the guardianship ended, defendant was liable for any acts that she committed during her tenure under *N.J.S.A.* 3B:12–55. The judge interpreted that to mean she was liable only for embezzlement or misuse of funds. But defendant is also answerable in these circumstances for her lack of compliance with the statute requiring court approval of herself as beneficiary. As a guardian who purported to make herself a beneficiary, she should

carry with her, past Teresa's majority, the presumption of undue influence. The burden should be on her to show that Teresa knew that the annuity would continue after her death, and knew that she had the ability to change the beneficiary.

The judge put the burden on plaintiff to show undue influence. In the circumstances, that was error. Based on the nature of the relationship between defendant and her daughter, and defendant's failure to obtain court approval for her initial designation, defendant had the burden to rebut a presumption of undue influence.

In sum, we are persuaded that there was a threshold factual question as to whether defendant advised plaintiff of her intent to name herself as beneficiary. Defendant claims she did and plaintiff agreed. If that is so, plaintiff cannot prevail. If fact-finding reveals, however, that plaintiff was not aware of and did not consent to defendant's naming of herself as beneficiary, the issue of Teresa's ratification of defendant being named the beneficiary must be explored. Defendant has the burden of proving that she did not exert undue influence on her daughter and that Teresa ratified the choice after attaining majority. These are factual issues that cannot be determined on summary judgment. For these reasons summary judgment was not warranted, and we reverse and remand for further proceedings.

Reversed and remanded.